May it please the Court, my name is Dennis McCubbin, I represent Rosewood Care Center. Before I start, I do want to call the Court's attention to a preliminary issue. We are abandoning our fifth round for appeal, the admission of the HITS Nursing Home Bill. In this case, Alfred Graves came to Rosewood Care Center for a one-week stay. His son brought him there while his son intended to go on vacation to Mexico. Alfred Graves had been living at home more or less independently. He was able to ambulate around his home without any assistance. He walked into Rosewood with no assistance from any person. He used a cane. The nurses saw him walk into Rosewood. He was given a nursing assessment when he got there, and they found him to be fully ambulatory. He could walk on his own, no problem. That was consistent with a doctor's order that was given by Dr. Wolfe on admission, that he was able to be up ahead lift, which means, according to Dr. Wolfe, He's able to ambulate, walk around, just like you and I. He can go to the restroom on his own. He can go anywhere on his own. He doesn't need any assistance. That was Mr. Graves' personal position, who gave that order to Rosewood when Mr. Graves was admitted. In this case, Mr. Graves went to his room at about 1230 in the morning. He attempted to get up and go to the restroom, and he fell. Nobody saw Albert fall. Nobody knows exactly what caused the fall. We are appealing this case based upon the fact that we feel that the manifest weight of the evidence so clearly favors Rosewood in this case that a new trial is required. Based with the fact that Albert Graves was fully able to ambulate on his own without assistance, that the testimony was from his son that he had never asked anybody for help to go to the restroom, he never needed any help to go to the restroom, and he was able to go to the restroom on his own for his entire life up until the day he entered Rosewood, and the fact that when he entered Rosewood, Dr. Wolfe, Mr. Graves' personal physician, was contacted by the Rosewood nurses and asked for the admission orders. The most permanent admission orders that were given with respect to this case was Dr. Wolfe said, Mr. Graves can be up ad lib. Mr. Graves requires no assistance. Mr. Graves requires no special safety measures to be taken. He can get up on his own and do what he wants while he's in the nursing home. What do you think was the basis of the pre-admission report that never made it into the nurses' operating file that indicated that he needed full assistance walking, he had problems with the toilet, he was confused, had orientation problems and everything? What do you think was the basis of that by your employee before, you know, in the home interview for pre-admission? Yes, sir. Your Honor, I believe that the basis for that was Mr. Marshaw's lack of medical training. He's not medically trained. And his general confusion about Mr. Graves' obstinance with respect to showering and getting dressed and somehow confusing that with his ability to ambulate. Mr. Marshaw, if you'll notice from that report, said that Mr. Graves required a walker. I don't know how he would have come to that conclusion because Mr. Graves never used a walker in his life. Mr. Graves' son had testified, as I said, who he's meeting with, that he got around the house just fine on his own. So honestly, I don't know how he came to that conclusion. Why didn't it get into the file for your employees to at least assess it, debate it, agree with it or disagree with it? I think the plaintiff's evidence on this case was that it violated a policy of Rosewood because it wasn't given to the director of nursing. It was, in fact, given to the administrator, who's the director of the nursing's boss. So the Rosewood facility was aware of the content of the file. And basically, I think that those types of reports are done so that the nursing home and the nurses kind of know what to expect when they get a patient in. But all of those preliminary reports by essentially intake personnel with no medical training are all superseded by the doctor's orders, the physician's orders for this gentleman, and the nurse's assessment. And when Mr. Graves went to Rosewood on the first day, he was fully assessed by the nurse there on duty, Nurse Childress, who assessed him consistent with Dr. Wolf's order as being fully ambulatory on his own. None of the plaintiff's evidence, and this is one of the, I think, most compelling reasons why the manifest weight of the evidence dictates a new trial should be granted. Plaintiff's evidence in the case was negligence in a vacuum, if you will, or negligence in the air. He never adduced any evidence which showed that Rosewood did anything to cause the fall or could have reasonably done anything to prevent the fall. This was complicated by the fact that the court, in the face of this bad evidence, allowed instructions that were confusing and wrong. And those instructions essentially let the jury do whatever they wanted to do with the case. The plaintiff, I'll give you an example, Your Honors, of the negligence, so-called negligence in a vacuum. Once the doctor, the physician, says Mr. Graves can be up ad lib, and once the nurses see Mr. Graves walk into the facility, and they assess his ability to ambulate, and they see, yes, he walks around just fine with a cane, and he goes to his room, and there's no indication whatsoever that he's ever had any problem going to the bathroom on their own, there would be no reason for Rosewood Care reasonably to take any intervention to, for example, provide assistance to him in going to the restroom. He can do it on his own. The plaintiff's evidence was, or plaintiff claimed, that there was no evidence that Mr. Graves got any care or attention from the time that he was admitted to the time of the accident. And he based that on some missing records. But if you look elsewhere in the file, such as the medication records, you will see that Mr. Graves received his medication at 8 p.m. He's admitted at 5. He received his medication at 8 p.m., and that's uncontradicted evidence. There's a nurse's note that he was checked on at 11 p.m. shortly, about an hour and a half before the accident. And in addition to that, there's testimony from the nurses that they made rounds. That's uncontradicted testimony, that they would have made rounds while they were on the floor, and that the CNA staff had to check on each patient every two hours. The problem with the argument is that there was no reason for Rosewood to have had to have checked on this man every interval, whatever interval the plaintiff might claim. There's no reason for them to do that. The man's in bed. He's able to get up on his own. There's no reason to think that he would fall going to the bathroom. He did, but there's no reason to think that he would. He fell at 12.30 in the morning. And this is another reason why we think that the jury applied an insurer standard to Rosewood. He fell at 12.30 in the morning, and if you think about it, there's only two things that would have prevented the fall. One would have been strapping him in bed. Two might have been to have someone sitting in the room with him at all times. Neither of those are the standard of ordinary care. Compounding the lack of evidence that Rosewood caused the injury was the instruction that was given with respect to neglect. As the court knows, nursing home care cases apply an ordinary care standard. That instruction was given, ordinary care, negligence in ordinary care, that was given as usual. But in addition to that, the court gave a neglect instruction, which was essentially an attempt to quote the regulation of the Nursing Home Care Act regulation on neglect. And in the plaintiff's brief, he raised the issue that that wasn't really given, that the word adequate was not really left out of the instruction, but actually it was. I'll call the court's attention to the transcript, to the record at page 289, the reading of the instruction left out the word adequate from that instruction. And the location of the written instructions actually given to the jury are in envelope 9, not in envelope 8, as the plaintiff had said in his brief. And that instruction, which was actually given to the jury, leaves out the word adequate. Now, it was wrong to give that instruction to begin with, because you've already got one instruction defining negligence, and now on top of that, a superfluous instruction that defines neglect. But if you're going to give the instruction, you at least have to give the full instruction with the word adequate in it, because leaving out the word adequate nursing care, leaving out that word adequate, creates a strict liability standard. It creates a standard that says that a facility shall not neglect a resident, and that neglect means a failure to prevent the injury. That's essentially what, when you leave that word out, that's what you get, is a strict liability standard on top of the usual ordinary care standard. The Supreme Court in Harris, which is cited in my brief, decided that neglect and negligence under the Nursing Home Care Act mean the same thing. And so this instruction on neglect didn't add anything, it just confused the jury, and it gave the jury an opportunity to say, here's another way we can decide that Rosewood's negligent. By looking at this neglect instruction, and it's all the more egregious because it didn't include the word adequate, so they could easily find strict liability. Once you give the jury two different instructions on neglect and negligence, how would they know that they're the same thing? The plaintiff contends that adequate was in the instruction. But if you look at the instructions, Your Honor, that were given to the jury, in envelope number nine, the instruction including the verdict form, that word adequate's not in there. And also, the record of the judge reading the instructions to the jury, he leaves out the word adequate. So based on those two facts, I think that it's clear. You're claiming that the plaintiff's contention that the word adequate was in the instruction is not correct? Yes. And I don't know if counsel for the plaintiff responded to whether the judge actually used the word adequate. You're contending he did not when he read them. Yes, that's correct. The error on the instructions, giving the neglect instruction, is not cured by also giving the right instruction. And there's cases in my brief that go to that issue. The Peary case, where they had the prudent man and the prudent investor standard. Even if the instruction would have been verbatim, it can be prejudicial because it's misleading. And I cited the Chacos case for that proposition, where they gave an instruction quoting verbatim the statute requiring the highway department to maintain highways, but stating that that created a strict liability situation and would have confused the jury, thrown them off track, and their track was supposed to be ordinary care. But that instruction, the verbatim statute, would have defeated the ordinary care instruction. And that's really what's happened here. In addition to that instruction, other instructions were given with regard to regulations, none of which were defined for the jury, none of which had really anything at all to do with preventing this fault or causing the fault. For example, the instruction that the nursing home personnel should assist and encourage residents with ambulation and transfer as often as necessary to maintain their highest practicable level of functioning. There's no evidence in the case as to how often is often enough, how often is necessary, what's the highest practicable level of functioning. None of that's defined. There was no testimony whatsoever about that. None of it's defined, and the jury, faced with that, would not have any idea how to define what violated that statute or that regulation, what didn't. What's the highest practicable level of functioning? No one knows. How often should Mr. Graves be assisted with his ambulation and transfer? As often as necessary. In this case, the defendant would argue that he didn't need any help at all. So injecting this into the case as an instruction, again, confuses the jury, and since it didn't apply to Mr. Graves because he didn't need any help, all it does is prejudice the jury against Rosewood because it allows the jury to decide on its own how often he should have been helped with his ambulation. There was also an instruction about the written policies, and the nursing home, an instruction that said that nursing homes are to have written policies in accordance with the Nursing Home Care Act. What's particularly troublesome about this is there was no evidence in the case whatsoever that Rosewood did not have policies in compliance with the Nursing Home Care Act. Nothing. So this was given without any basis in fact whatsoever. In addition to that, it didn't tell anybody what Rosewood did that was supposedly in violation of the statute. There was no evidence of that whatsoever. And in fact, what's cited in Plaintiff's brief is, well, they were supposed to have these ADL flow sheets, these record-keeping things, and they were supposed to have policies which governed the maintaining of those records. But the evidence in the case on the record is that the records which Mr. Graves contends were not there are not required by the Nursing Home Care Act. Those were Rosewood's criminal documents. Thank you, Counsel. Thank you. Counsel? I'm pleased to coordinate your honor, Counsel. I'm Robert Gregory. I represent the plaintiff in this case, Paul Graves, who is the administrator of the estate of his father, Alfred, who was the resident who was injured at Rosewood Care Center in January of 2003. It is the plaintiff's position in this case that the jury verdict was not a contrary to the manifest weight of the evidence for numerous reasons. This case, as the court would see from the transcript, lasted one week, including war dire as well as closing arguments. There were numerous witnesses called by the plaintiff as well as the defendant in this case, and while there is as inevitable in jury trials conflicting evidence, the jury had the opportunity to listen carefully to the evidence, judge the credibility of the witnesses, and make a decision in this case. Alfred's treating physician, Dr. Wolfe, the testimony is clear, had just assumed Alfred's care from a prior position. He saw him on one and only one occasion in late October of 2002. At the time that he examined Alfred in his office, he found Alfred to be disoriented in place. That is, he did not know where he was, so he was, as had been previously diagnosed, suffering with some symptoms of dementia. Paul testified as to his observations of his father's decline in overall physical condition as well as his decline in mental capacities, including having gotten lost while he was out for a drive while he was in Florida, receiving a call from the police that his father was found disoriented and could not find his way back home. He also testified as to two falls that Alfred had had while he was at the house that he shared with Paul and Paul's wife, Judy. Actually, he had slipped off the toilet seat. There was a balance issue or concern. These matters were all brought to Steve Marsho, whose title at Rosewood is the admissions coordinator, when Mr. Marsho visited Paul and Alfred's home several days prior to Alfred's respite admission to do a level of care assessment. As the court is familiar with, Mr. Marsho assessed Alfred as needing standby assistance for supervision with transfers as well as staff supervision to ensure his safety at Rosewood due to confusion or lack of orientation. Now, by Rosewood's own policy, the level of care assessment is to be provided by the admissions coordinator to the director of nursing for the facility for her review and determination of the appropriate nursing care and attention that should be given to the resident. Mr. Marsho testified that he did not provide that to the director of nursing. He placed it in the administrator's office, and the administrator testified that that got filed, and his financial file never became part of his nursing chart. So there is no way that the nursing staff had an opportunity to review Rosewood Care Center's own employees' pre-admission level of care assessment. Now, when Alfred appeared at the facility late afternoon on the 17th of January, 2003, for his admission for respite care, he came with his son, Paul. He walked in with a cane. The way the procedure works at Rosewood is that the floor nurse on whatever hall or wing the resident is to be admitted has the additional duty of doing an initial nursing assessment. So the nurse who was involved in this, Tanisha Childress, did an initial nursing assessment or at least started one. Her assessment differed in very material respects from Mr. Marsho's, but of course Rosewood did not have the opportunity to compare these and determine what is this resident's real level of need There was also supposed to be a nursing admission checklist that is performed by the floor nurse or admitting nurse that is supposed to check off, much like the pre-flight checklist that pilots use, those things that need to be done to get the resident properly admitted. Now, Ms. Childress testified that she always did that, but there was no nursing admission checklist available, even though it was requested by the plaintiff and discovered. And one of the important issues in this nursing admission checklist is to check off that the resident has been oriented to his room and understands and is oriented to how his call line operates so that if the resident needs help, he or she can summon the nursing staff for help or CNAs. There is also supposed to be a CNA, a certified nurse's aid checklist completed by the CNA staff, which goes over much the similar ground. The same thing to ensure the resident's safety, orientation of the facility, that they know how the call line works. That's another document by Rosewood's own policy that should be completed at the time of the resident's admission. It was not provided to me, even though requested and discovered. The jury heard conflicting evidence on the issue of what, if any, nursing care was provided to Alfred Grace at the time of his admission until the time that he was found on the floor with his hip fracture. But the last nursing note that actually evidences hands-on nursing assessment was a note done at 6 p.m. on the 17th of January by Nurse Childress where she goes to his room, finds that he's very reluctant to be there. She cannot perform a scan assessment or a total body assessment because Alfred does not want to remove his clothing or his coat. And so when she leaves him at 6 p.m. on the 17th, he's still lying on top of his bed, fully clothed with his coat on. The next nursing chart notation is by Nicole Jax, who was the nurse who came on at 10 p.m. with a shift and ended at 6 a.m. That nurse's note does not clearly indicate that there was any actual nursing assessment or care provided by Ms. Jax. What it says is receive him report that Alfred Grace refused to take off his coat, was lying in his bed on top of his bedsheet. So there is ample evidence that Mr. Grace may not have received any nursing care retention from 6 p.m. on Friday the 17th until he is found initially by a roommate who notifies the nursing staff that Alfred has fallen in his room. And at that point, Nicole Jax goes into the room, assesses him. He has pain in his left hip and is ultimately diagnosed as having a hip fracture. Nicole Jax testifies that subsequent to finding Mr. Grace and assessing him and getting his immediate needs met, she then, they place him back into bed. She, at that point, attempts to utilize the call light and finds that the call light's not working. So there's an inoperable call light. Was there evidence that he attempted to use his call light? There is no direct evidence that he attempted to use his call light. But he did relay to Ms. Jax, the nurse, that he was attempting to go to the restroom. He had a cane. That cane was located not close to him in his room, as I recall from the evidence. He's disoriented. He's in a brand-new facility. He's reluctant to be there. And there's not even an optimal call light provided to him. Where was the call light in relation to where he fell? The call light was close to his bed, I mean, or on his bed, but it was not optimal. I think all of these factual matters, Your Honors, provide ample evidence that the jury could find that I do not think that the defendant in this case can show, nor has it shown, that the verdict was palpably erroneous, unwarranted, or not based on the evidence as required by this Court's ruling in Cummings v. Shaw. Now, as to the defendant's assertion that somehow or another the plaintiff attempted to make Rosler insurer of the plaintiff's safety, that's just simply not true. There was no argument in the trial, no jury instruction submitted to the jury that that was, in fact, what the law was. The defendant's citation to Flynn v. Brogan v. Four Fountains is inapplicable here. In that case, the plaintiff's counsel attempted to submit a non-IPI jury instruction, raising a rebuttable presumption that an injury to a nursing home resident was evidence of failure to provide adequate general supervision. Judge Matosian refused to grant that trial. That was the sole issue on appeal before this Court, and this Court affirmed Judge Matosian, because it's simply not the law. But that wasn't what occurred in Graves v. Rosler. They were properly instructed on this. Now, with regard to the definition of neglect and the necessity of this Court, the trial court, having given instruction defining that, we tendered, the plaintiff tendered instruction number 20, which defined neglect, which is the definition of that term set forth in the Illinois Nursing Home Care Act, 210-ILCS45-1-117. This case was brought pursuant to the Illinois Nursing Home Care Act, and in these types of cases, it is incumbent upon the trial court to instruct the jury on the definitions of both negligence and neglect. I think it's important that that be done, and also necessary that it be done, because even though the plaintiff's burden of proof is to show that the defendant failed to provide ordinary care for the plaintiff's safety, as the Harris case holds, the Nursing Home Care Act utilizes the term neglect as well as negligence in the act. The definition says that an administrator or an owner shall not neglect a resident. But in the part of the Illinois Nursing Home Care Act that gives the private clause of action to a resident, it says that the owner and licensee shall be liable for any intentional or negligent act which causes injury to a resident. So in this case, we submit that the court promptly gave Plaintiff's Tender Construction No. 27, which is a 60-series instruction concerning the plaintiff's allegation that the defendant violated Illinois Administrative Code provision by neglecting Alfred Grayson in violation of the code, and therefore, the Nursing Home Care Act. What about the issue of the word adequate? In this respect, I would cite to the court the cases that say that non-IPI instructions should be simple, brief, impartial, and free from argument. It's a section 60 series, but it also utilizes the definition of neglect incorporated within that section 60. The plaintiff did indeed tender the correct jury instruction to the court pertaining to the word adequate. It was following a jury instruction of confidence. With respect to the defendant's claim that the word adequate was left out, it is the position of the plaintiff that I think the defendant waived the suggestion on this point, but failing to object to the reading of the instruction without that word, when it was read to the jury prior to the time that the jury retired to deliberate the verdict. Any discrepancies at that point in time could have been easily remedied. There were several counsels, as well as a pair of legal defense counsels, who all had a set of jury instructions. Furthermore, it is the plaintiff's position that I do not believe that that issue was specifically raised in the defense motion for a new trial, nor did the defendant tender an instruction contrary to the plaintiff's instruction, which did, in fact, pertain to the word adequate. This court, in the Howlett v. Donaldson case, noted that the trial court's determination is an instruction to be given, won't be disturbed, absent an abuse of discretion, and the test is whether or not the instructions, when considered as a whole, are clear enough to avoid misleading the jury, and whether they fairly and accurately state the applicable law. Now, assuming argumentative that the jury instruction was faulty, the court has held that a judgment will not be reversed unless they mislead the jury and claim part of separate prejudice, citing again Howlett v. Donaldson and Davros v. Wayne. So it is our position that proper instruction was tendered, and if the court, in fact, omitted adequate and misleading instruction to the jury, that it could easily have been corrected at the time, and there was no objection by defense counsel to that issue. We believe, furthermore, that the trial court promptly instructed the jury on violations of administrative code provisions in this case. Number 25, jury instruction number 25, which said that all nursing personnel shall assist and encourage residents with ambulation and transfer activities as often as necessary. There was a basis in the evidence for giving that because of Mr. Marshall's assessment on his pre-admission level of care assessment, the fact that Alvin was disoriented, fell about going to the bathroom, the fact there was an inoperable call light. This was properly given by the court as an administrative code provision that the jury could take into consideration, including all the other evidence, in determining whether or not the defendant was negligent as alleged by the plaintiff. Instruction number 26, with respect to the policies, that is that the facility shall have and follow written policies and procedures. There is abundant evidence in this case that the defendant failed to follow his own policies and procedures that were put in place to ensure or provide for residents' safety and provision of adequate nursing care by the facility to the residents. First of all, there was evidence that the defendant failed to follow its own policies regarding the nursing admission checklist, which were not provided to me. There were no CNA activity of daily living flow sheets to document care provided to Mr. Graves from the time of his admission until the time of his injury. And there's no evidence, as required by Roosevelt's own policy, that Mr. Marshall's level of care assessment was provided to the director of nursing, the chief nurse, at the facility whose job it is to oversee the remaining nursing staff as well as CNAs, again, to ensure that adequate and proper nursing care is given to the residents. Number 27 was properly given, as we had previously discussed, and owners shall not neglect the residents. Now, I didn't hear the counsel for the defendant remark much on this, but I did address this in my brief because they claimed that the trial court improperly instructed the jury by giving adverse inference instruction. It is the plaintiff's position that there was more than adequate basis in this case to provide adequate, I mean, adverse inference instruction. There were no, as I pointed out, no nursing admission or CNA admission checklist provided to me, contrary to their own policies, that those need to be maintained. No CNA ADL flow sheets. Alfred Graves was returned to the facility in January of 2003 after his hip surgery, and he remained in Roseland until April of 2003, receiving physical therapy. At that point, Paul Graves made the decision to transfer Alfred to a nursing home in Alhambra by the name of Hitz. So he doesn't leave the facility until April of 2003. In August of 2003, he is, we filed suit in this case. First of all, the administrator of this case said, we don't keep those documents. They're not made part of the charge. I had to impeach her. I had to get documents from other files that I had against Rosewood and impeach her the following day, at which point she recanted her testimony and said, yes, they are. These were not provided to me in discovery. They could have documented, and they've been beneficial to the defendant. It is our position that they would have been produced, and I think that the trial court did not abuse its discretion in the decision to give this instruction. One final point I need to make quickly before my time is up is I believe that this case should be affirmed in its entirety and remanded to the Circuit Court of Madison County for further consideration of attorney's fees. In this court's decision in Rath v. Carbondale Nursing and Rehab, it implicitly adopted the ruling of Burlap v. Villa Scalabrini Nursing Home with respect to the propriety of awarding post-judgment attorney's fees for a successful plaintiff's prosecution of an appeal. And I cite that case to the court. Even though it was not precisely before the court at that point, because there was no pending petition, I believe that this court has implicitly adopted the Burlap, which says that it would be reversible error not to do that. And so we are asking the court to affirm in its entirety and remand the case to Judge Hill for reconsideration of further attorney's fees. Thank you, counsel. Counsel? Do you dispute, is there any dispute that the call button is not working? No, no, your honor. There's no dispute about that. What the dispute would be is the relevance of that issue. It's another one of those issues that were injected in the case by the plaintiff. It's essentially a red herring, and let me tell you why. Paul Graves ambulated on his own. It was testified he never asked anybody for help to go to the bathroom. In addition to that, when he was found on the floor by the nurse, he didn't tell the nurse, I tried calling you on the call line and nobody came. He never once, in the year and a half that he lived after this call, he never once told anybody I tried to use the call line and nobody came. It's another one of the typical plaintiff's arguments in this case that the jury could have inferred that he tried to use the call line and it didn't work. But it's the defendant's position that it wouldn't be a reasonable inference to infer that. And that's exactly like the rest of the evidence. When you talk about Alfred Graves' dimension, there was no testimony into the case as to the extent of that dimension, whether it was just some slight forgetfulness or what it was, what the extent of it was, or how it caused the fall. There's no evidence in the case whatsoever that it caused the fall. In terms of falling at home, Mr. Graves' son testified, and it's in the reply brief, that the fall at home is not at all related to or like the fall at Rosewood. He fell at home by slipping off a toilet seat, a special medical toilet seat that the son had installed for him, and the toilet seat actually slipped. So that fall has no relevance either. Basically, the defense case in a nutshell and the reason why a new trial is so compelling here is that it would never or it should never be a breach of ordinary care to obey a doctor's instructions in this instance. How could it be? What's your response to the waiver argument on the omission of the word adequate? I don't believe we waived it. The issue was raised in an instruction conference by me. The plaintiff was charged with drafting a new instruction which contained the word adequate. Whether the plaintiff did that or not, I don't know. But what I do know is that the judge didn't read it. Did you object? No, I didn't. Did you raise it in a post-trial motion? I did not. I wasn't looking for that. I'm sorry I missed that, plain and simple. One word out of all the instructions. But my other response to the waiver issue would be it's such an egregious error to leave out the word that changes this from a strict liability instruction to an instruction where the jury would actually have to determine whether or not the nursing care was adequate and apply some standard of care. That should be plain error. What's your response to the request of the plaintiff if we affirm to remand for attorney's fees pursuant to wrath? The attorney fees were not raised on any notice of appeal. I think it would be in the inherent power of the court to remand it, to instruct the trial court to make a finding on that, but not to instruct the trial court to add attorney fees. The call-out raises another interesting question, along with the lack of documentation. The documentation throughout the trial, the plaintiff claimed that there's no evidence that this man ever got any nursing care. These documents don't exist. Then he gets an adverse inference instruction because we didn't produce the documents. But the court failed to make a threshold decision on whether or not that should be given because there was adequate excuse for not giving the documents. The testimony from the Rosewood people were these weren't permanent documents. They were checklists which were discarded before the suit was filed if they existed at all. They weren't believed by most people to exist at all because of the short time Mr. Griggs was there at the nursing home. Go ahead. Please finish your sentence. One of the documents, in fact, was a document that – well, I lost my train of thought. It's okay. We'll pick it up from the brief. It's in the brief, yes. Thank you. Thank you. We appreciate the briefs and arguments of counsel, and we'll take this case under advisement.